# United States Court of Appeals for the Federal Circuit

———————————

**LEVITON MANUFACTURING COMPANY, INC.,**
*Plaintiff,*

**v.**

**UNIVERSAL SECURITY INSTRUMENTS, INC.,**
AND **USI ELECTRIC, INC.,**
*Defendants.*

-----------------------------------------------------------

**SHANGHAI MEIHAO ELECTRIC INC.,**
*Plaintiff-Appellee,*

**v.**

**LEVITON MANUFACTURING COMPANY, INC.,**
*Defendant-Appellant.*

———————————

2009-1421

———————————

Appeal from the United States District Court for the District of Maryland in consolidated case no. 05-CV-889, Judge Andre M. Davis.

———————————

Decided: May 28, 2010

———————————

SUSAN B. MANNING, Bingham McCutchen LLP, of Washington, DC, argued for plaintiff-appellee. Of counsel

on the brief was GARY M. HNATH, Mayer Brown LLP, of Washington, DC.

J. MICHAEL JAKES, Finnegan, Henderson, Farabow, Garrett & Dunner, LLP, of Washington, DC, argued for defendant-appellant. With him on the brief were EDWARD J. NAIDICH; and BETH Z. SHAW, of Reston, Virginia. Of counsel on the brief was JAMES T. HOSMER, Nixon & Vanderhye, P.C., of Arlington, Virginia.

―――――――――――

Before MICHEL, *Chief Judge*, PROST and MOORE, *Circuit Judges*.

Opinion for the court filed by *Chief Judge* MICHEL.

Dissenting opinion filed by *Circuit Judge* PROST.

MICHEL, *Chief Judge*.

Defendant-Appellant Leviton Manufacturing Company, Inc. ("Leviton") appeals the district court's award of attorney fees and costs to Plaintiff-Appellee Shanghai Meihao, Inc. ("Meihao") based on inequitable conduct and vexatious litigation. We vacate and remand for the reasons below.

## I.   BACKGROUND

On October 22, 2003, Leviton filed U.S. Patent Application No. 10/690,776 ("Germain application"), which claims priority to a February 3, 2003 provisional application. Greenberg Traurig attorneys Paul Sutton, Barry Magidoff, and Claude Narcisse filed and prosecuted the Germain application. It lists Franz Germain and five others as co-inventors. Each of these inventors submitted to the U.S. Patent and Trademark Office ("PTO") a sworn

declaration that he was an original inventor of the subject matter which was claimed.

Six months later, on April 19, 2004, Leviton filed U.S. Patent Application No. 10/827,093, which later issued as U.S. Patent No. 6,864,766 ("the '766 patent"). The '766 is a third-generation continuation of U.S. Patent No. 6,246,558 ("the '558 patent"). The application for the '558 patent was filed on August 20, 1999, and Leviton has claimed that the '766 patent is entitled to this priority date. Nicholas DiSalvo and William Ziegler are named as the inventors of the '766 patent. Both of these inventors also submitted to the PTO a sworn declaration that he was an original inventor of the subject matter which was claimed.

The '766 patent and the Germain application have no common inventors, and neither claims priority to the other. The '766 patent's claimed 1999 priority date is three and a half years before Germain's claimed 2003 priority date. The '766 patent and Germain have many claims that are nearly identical. For example, the only difference between claim 1 of the '766 patent and claim 31 of the Germain application is that claim 1 recites "*at least one* moveable bridge" whereas claim 31 recites "*a* movable bridge." And dependent claims 3, 4, 13 and 14 of the '766 patent are identical to Germain claims 32, 31, 43 and 44.

Meihao and Leviton offer different explanations as to the similarity of the claims. Meihao contends that Narcisse "copied" the claims from the Germain application into the application that matured into the '766 patent. Leviton explains the similarity by stating that several months after Narcisse filed the Germain application, he met with several Leviton engineers, including William Ziegler, one of the inventors of the '558 patent. At that meeting, Narcisse learned that the broad reverse-wiring protection concept he claimed in the Germain application had actually been described in the '558 patent over three

years earlier, having already been invented by Ziegler and DiSalvo. Afterwards, Narcisse prepared a continuation of the '558 patent with claims directed to that feature.

During the prosecution of the '766 patent, Leviton did not disclose the Germain application or the fact that certain claims had been copied from Germain into the application for the '766 patent. Moreover, Leviton did not inform the PTO that it had previously submitted a sworn declaration in which other individuals (the Germain inventors) claimed to be inventors of subject matter very similar to that which was now recited in the application for the '766 patent.

In June 3, 2005, two months after the '766 patent issued, Leviton disclosed the '766 patent, the '558 patent, and thirty other references during the prosecution of the Germain application. In September 2005, having learned of the substantively identical claims, the PTO issued a double-patenting rejection of the Germain application in light of the '766 patent. Leviton cancelled the similar claims.

A reexamination of the '766 patent was requested on June 6, 2005. Leviton did not disclose the Germain application or the related litigation to the PTO during the seven months in which the examiner reconsidered the patentability of the '766 patent. On February 17, 2006, the examiner confirmed all claims of the '766 patent, and the reexamination requestor appealed. Leviton filed its appeal brief on June 16, 2006, but did not disclose the Germain application or related litigations to the PTO, though it had been aware of inequitable conduct allegations for over a year.

Narcisse first referenced the Germain application and asserted that it was not material information in a memorandum to the PTO dated August 7, 2007. Although Narcisse titled his memorandum "Information Disclosure

Statement" ("IDS"), it is not formally an IDS because it does not meet any of the requirements for an IDS. Narcisse also submitted several standard PTO forms titled "Information Disclosure Statement by Applicant" that comply with PTO rules, but these IDS forms did not list the Germain application.

During the district court case, Meihao sought discovery of the facts related to the inequitable conduct defense. Meihao argued that Leviton's counsel unreasonably and self-servingly tried to avoid discovery of Leviton's own misconduct. When Meihao issued subpoenas to Sutton, Magidoff, and Narcisse, the witnesses did not object, did not produce documents, and did not appear for their scheduled depositions. Leviton belatedly moved to quash primarily on the ground that the witnesses were acting as Leviton's litigation counsel. In March 2007, Greenberg Traurig withdrew and was replaced by Nixon Vanderhye.

Narcisse and Magidoff subsequently appeared for depositions, and Leviton's new counsel made numerous privileged advice and work product objections and repeatedly instructed the witnesses not to answer. During Narcisse's deposition, counsel made 96 privileged advice and work product objections, and over a third of the time explicitly instructed Narcisse not to answer. Many of these questions were about the relationship between the Germain application and claim 1 of the '766 patent, or Narcisse's rationale for failing to disclose the Germain application to the PTO. For example, Narcisse declined to answer the following questions claiming the work-product exception:

- Can you tell me with respect to Claim 1 where you got the language for Claim 1?

- So isn't it a fact that Claim 1 of the '766 application was copied from Claim 31 of the Germain application?

- Can you tell me where you got the phrase, "moveable bridge"?
- Did you consider disclosing the Germain application to the PTO?
- How do you explain the similarity in claim language?

Magidoff refused to answer similar questions, also on advice and objection by counsel. The district court found that these objections were baseless.

Another round of briefing ensued, with Meihao seeking an order compelling Narcisse and Magidoff to appear for further deposition and to fully answer Meihao's questions, and also compelling Sutton to appear for deposition. The matter was argued and submitted to Magistrate Judge Gauvey on September 17, 2007. Meihao's motions to compel were still pending when Leviton moved to dismiss the case in November 2007, but the magistrate judge noted that he was about to grant them.

On November 28, 2007, Leviton moved to dismiss the case. Leviton asserts that it dismissed the case because it succeeded in forcing Meihao to stop selling older-model, allegedly infringing products. Meihao alleges the real reason Leviton moved to dismiss its case was that it wanted to avoid a finding that the '766 patent is unenforceable. Leviton has more than 30 different issued patents and patent applications that relate to the '766 patent, and Leviton's counsel of record on the '766 patent was also counsel of record in the PTO on several hundred Leviton patents. The district court dismissed the case with prejudice on December 17, 2007 and gave Meihao leave to file a motion for fees and costs.

The magistrate judge held a hearing on the motion for fees and costs on September 3, 2008 and issued a 128 page Memorandum Opinion on December 23, 2008 in which she found that Leviton had committed inequitable

conduct, had engaged in a strategy of vexatious litigation, and that an award of fees to Meihao was proper. District Judge Andre M. Davis issued an opinion on May 12, 2009 accepting Magistrate Judge Gauvey's report and recommendations. The district court entered two money judgments in favor of Meihao together totaling $1,046,353.10 in costs and reasonable attorney fees.

## II. DISCUSSION

### A. *Attorney Fees*

The Patent Act provides, "The court in exceptional cases may award reasonable attorney fees to the prevailing party." 35 U.S.C. § 285. "The prevailing party may prove the existence of an exceptional case by showing: inequitable conduct before the PTO; litigation misconduct; vexatious, unjustified, and otherwise bad faith litigation; a frivolous suit or willful infringement." *Epcon Gas Sys., Inc. v. Bauer Compressors, Inc.*, 279 F.3d 1022, 1034 (Fed. Cir. 2002). We review a district court's finding that a case is "exceptional" within the meaning of § 285 for clear error. *Forest Labs., Inc. v. Abbott Labs.*, 339 F.3d 1324, 1328 (Fed. Cir. 2003). Once a case is determined to be exceptional, we review the district court's decision to award attorney fees under an abuse of discretion standard. *Id.*

The district court based its grant of attorney fees on both (1) inequitable conduct and (2) vexatious litigation. Leviton challenges each of these holdings, as we discuss below.

### B. *Inequitable Conduct*

We review the district court's decision to grant summary judgment for inequitable conduct *de novo*. *See Eisai Co. v. Dr. Reddy's Labs., Ltd.*, 533 F.3d 1353, 1359 (Fed. Cir. 2008). Summary judgment may only be granted

where there are no genuine issues of material fact. *Anderson v. Liberty Lobby, Inc.*, 447 U.S. 242, 248 (1986). To prevail on inequitable conduct, an accused infringer must show that the applicant: "(1) made an affirmative misrepresentation of material fact, failed to disclose material information, or submitted false material information, and (2) intended to deceive the [PTO]." *Cargill, Inc. v. Canbra Foods, Ltd.*, 476 F.3d 1359, 1363 (Fed. Cir. 2007).

### 1. *Materiality*

Under our scattered precedents, information may be considered material if there is a "substantial likelihood that a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent." *PerSeptive Biosystems, Inc. v. Pharmacia Biotech, Inc.*, 225 F.3d 1315, 1321 (Fed. Cir. 2000); *see also Digital Control, Inc. v. Charles Machine Works*, 437 F.3d 1309, 1314 (Fed. Cir. 2006) (holding that omissions and misstatements are material if "a reasonable examiner would have considered such [information] important in deciding whether to allow the . . . application"). Information concealed from the PTO "may be material even though it would not invalidate the patent." *Larson Mfg. Co. v. Aluminart Prods. Ltd.*, 559 F.3d 1317, 1327 (Fed. Cir. 2009) (quoting *Li Second Family Ltd. V. Toshiba Corp.*, 231 F.3d 1373, 1380 (Fed. Cir. 2000)). However, "a withheld otherwise material reference is not material if it is merely cumulative to, or less relevant than, information already considered by the examiner." *Larson*, 559 F.3d at 1327.

### a. *Germain Application*

We agree with Meihao and the district court that Leviton's failure to disclose the Germain application was material. Leviton argues that its failure to disclose Germain was not material for any of the reasons cited by

the district court, contending that: (1) Leviton did not "copy" claims under 37 C.F.R. § 10.23(c)(7); (2) the disclosure of Germain would not be material to inventorship; (3) the disclosure of Germain would not be material to double patenting; and (4) the disclosure of Germain would not be material to written description. We consider each of these arguments below.

Leviton first challenges the district court statement that "information on 'copying' of claims is essentially material *per se* under the PTO regulations," citing 37 C.F.R. § 10.23(c)(7) (2004).[1] Section 10.23(c)(7) requires identifying to the PTO "a patent or patent application of another from which one or more claims have been copied." Leviton alleges that § 10.23(c)(7)'s reference to "copying" is only directed to the interference context because it refers to provisions that address a request for an interference. In this context, Narcisse's interpretation "of another" meant another patent owner, and not another inventive entity. Leviton further argues the concept of "copying" is a term of art used exclusively in the interference context.

Meihao responds that "copying" means "copying" and there is no language that limits it to the interference context. Moreover, Meihao responds that the rules do not apply solely to interferences involving different patent owners, but also explicitly apply to interferences involving different patent applicants. *See* 37 C.F.R. § 1.41(a) ("Unless the contrary is indicated the word 'applicant' when used in these sections refers to the inventor or joint inventors who are applying for a patent.").

---

[1] Leviton suggests that the district court found that Meihao committed inequitable conduct *per se* based on "copying" the claims. This is incorrect. The district court concluded that the copying of claims is "essentially material *per se*" but not inequitable conduct *per se*.

We agree with Leviton that § 10.23(c)(7) is primarily directed to the interference context. Section 10.23(c)(7) specifically refers to § 1.604(b) and § 1.604(7)(c), both of which address a request for an interference. Leviton did not request declaration of an interference in this case. Indeed, an interference generally cannot be declared between applications by a single party. Thus, we agree with Leviton that § 10.23(c)(7)'s express prohibition on the "copying" of claims is not applicable to the instant situation.

Second, Leviton argues that the Germain application was not material to inventorship. Leviton contends that if the '766 claims are supported by the common specification of the '766 and '558 patents, then Germain and his coinventors could not have conceived the inventions in the '766 claims, because those inventions were described several years earlier in the '558 patent.

Meihao responds that a reasonable examiner would want to know if two different applications had two different sets of inventors that both claimed to make the same invention. Meihao contends that an examiner would not automatically discount the Germain application in determining inventorship simply because it had a later priority date because no person may patent an invention that "he did not himself invent." 35 U.S.C. § 102(f).

We agree with Meihao that the Germain application was material to inventorship. Even if one application had an earlier priority date, the examiner would have to evaluate which set of inventors actually conceived of the invention. *See Invitrogen Corp. v. Clontech Labs, Inc.*, 429 F.3d 1052, 1063 (Fed. Cir. 2005) (Conception of an invention is the "formation in the mind of the inventor, of a definite and permanent idea of the complete and operative invention, as it is hereafter to be applied in practice."); *Hitzeman v. Rutter*, 243 F.3d 1345, 1358-59 (Fed. Cir. 2001) ("[A]n inventor who failed to appreciate the

claimed inventive features of a device at the time of alleged conception cannot use his later recognition of those features to retroactively cure his imperfect conception."). It is not enough for Leviton to claim that the earlier specification does in fact support the claims. Neither an inventor nor his counsel may graft claims onto an earlier specification if those claims do not reflect what the inventor actually invented at the time of the earlier application.

The copying of certain claims from the Germain application with one set of named inventors into the '766 patent application with another set of inventors suggests that the named inventors may not have, in fact, invented the claimed subject matter. Here, Leviton submitted patent applications and sworn inventorship declarations from two different sets of inventors, both attesting that they were inventors of the claimed subject matter. Had the examiner been aware that different Leviton employees each claimed to be first inventors of the same subject matter recited in the same claims, it would have raised serious questions regarding inventorship–an issue that is clearly material to patentability. Moreover, as we have acknowledged, "whether the inventorship of the patents as issued is correct does not determine the materiality of the statements in this case, just as whether concealed prior art would actually invalidate the patent is irrelevant to materiality." *See PerSeptive*, 225 F.3d at 1322; *Larson*, 559 F.3d at 1327. Even if the examiner might have ultimately concluded that DiSalvo and Zeigler invented the claimed subject matter, the nearly identical claims raise a substantial inventorship question that would have required additional investigation by the examiner. Thus, we hold that Leviton's failure to disclose the Germain application during the prosecution of the '766 patent was material.

Third, Leviton argues that the district court erred by considering the Germain patent material to double patenting. According to Leviton, the intent of the double-patenting rule is to allow the PTO to prevent two patents from issuing at different times with the same claims. Leviton contends that Narcisse gave the PTO the information to evaluate the double-patenting issue during the prosecution of the later-priority (but earlier-filed) Germain application. Moreover, Leviton contends that the PTO could not use the Germain application to make a double-patenting rejection in the '766 patent prosecution because the examiner would have allowed the earlier priority patent to issue if there were no other rejections remaining.

Meihao responds that a reasonable examiner would consider Germain material to double patenting. Moreover, Meihao points out that, under Manual of Patent Examining Procedure ("MPEP") Section 804, the PTO examiner would first issue a provisional double patenting rejection to *both* the application for the '766 patent and the Germain application before withdrawing one of those rejections.

We hold that the copying of claims would be material to the issue of double-patenting because a reasonable examiner would want to consider both applications. Although it is unlikely that the examiner would ultimately apply the double patenting rejection to the application with an earlier priority date, the double patenting issue would typically lead to an immediate provisional rejection as to each application. *See* MPEP Section 804. Once all other rejections are resolved, the provisional rejection can be withdrawn to one application, which will then issue as a patent. While the rejection may be withdrawn as to the application with the earlier filing date, it is not required by the MPEP Guidelines. Thus, the PTO could have rejected the '766 patent for double-patenting.

Accordingly, we conclude that knowledge of the Germain application during the '766 patent prosecution would be material.

Finally, Leviton argues that the disclosure of the Germain application during the '766 prosecution would not have affected the examiner's conclusion that the claims were supported by the specification. Leviton notes that the examiner stated (in the context of the double-patenting issue) that the '766 patent "disclose[s] everything claimed [in Germain] except the use of a latched reset lockout with the interrupting device." Leviton argues that nobody has had trouble recognizing that the claimed "movable bridge" is described in the '766 specification as the movable contact arms 50 and 70. Leviton argues that the written description issue only concerns whether the description would allow persons of ordinary skill in the art to recognize that the inventor invented that which is claimed.

Meihao responds that this is improper "but for" argument of what the examiner would have done. Meihao argues that in not disclosing Germain, Leviton withheld the very reference that would have caused any reasonable examiner to question the '766 patent application's compliance with the statute.

We agree with Leviton that the Germain application is not material to the written description requirement. Pursuant to 35 U.S.C. § 112, ¶ 1, the '766 patent specification must support its claims. The Germain application does not affect whether the '766 patent specification supports its claims, and thus should not affect a reasonable examiner's assessment. Nevertheless, because a reasonable examiner would want to consider the Germain application with respect to inventorship and double patenting, the district court correctly concluded that the failure to disclose the Germain application during the '766 patent prosecution was material.

b.  *Related Litigation*

Leviton also challenges the district court's conclusion that Leviton's failure to disclose related litigation during the prosecution of the '766 patent was material. Meihao identified twelve cases filed before the '766 patent issued involving its parent patents that Meihao contends should have been disclosed during the prosecution of the '766 patent. Leviton does not dispute that the parent patents of the '766 patent were litigated in at least a dozen lawsuits filed before the '766 patent issued. Leviton also does not dispute that it was aware of those cases, as well as the allegations of invalidity and unenforceability made in many of them. Leviton instead argues that the fact that Leviton succeeded on the validity of those patents shows that those litigations were not material. We disagree. Leviton violated the requirements of MPEP § 2001.06(c) and this Court's precedent by failing to bring these cases to the PTO's attention. *See Nilssen v. Osram Sylvania, Inc.*, 504 F.3d 1223, 1224 (Fed. Cir. 2007) (holding that the existence of earlier related litigation itself was material information). Leviton should have disclosed the existence of the cases themselves and material information from those cases, not just invalidating prior art. MPEP § 2006(c) expressly notes that defenses raised against validity or charges of inequitable conduct would be material to patent examination:

> For example, the defenses raised against validity of the patent, or charges of "fraud" or "inequitable conduct" in the litigation, would normally be "material to the examination" of the reissue application. It would, in most situations, be appropriate to bring such defenses to the attention of the Office by filing in the reissue application a copy of the court papers raising such defenses. At a minimum, the applicant should call the attention of the Office to the litigation, the existence and

the nature of any allegations relating to validity and/or "fraud," or "inequitable conduct" relating to the original patent, and the nature of litigation materials relating to these issues.

Thus, Leviton should have disclosed these litigations, not merely ones where a patent was invalidated. The failure to disclose such litigations normally would be material, and we conclude that they are material here.

### 2. *Intent to Deceive*

We next consider whether Leviton withheld the Germain application and related litigation with an intent to deceive the PTO. This Court has held that the intent to deceive must be "viewed in light of all the evidence . . . . Intent need not, and can rarely be, proven by direct evidence. Rather, intent to deceive is generally inferred from the facts and circumstances surrounding the applicant's overall conduct." *Impax Labs., Inc. v. Aventis Pharmaceuticals, Inc.*, 468 F.3d 1366, 1374-75 (Fed. Cir. 2006); *see also Cargill, Inc. v. Canbra Foods, Ltd.*, 476 F.3d 1359, 1364 (Fed. Cir. 2007) ("[B]ecause direct evidence of deceptive intent is rarely available, such intent can be inferred from indirect and circumstantial evidence."). Even if the nondisclosed information is of "relatively high materiality," however, inequitable conduct cannot be found where "[the patentee] offer[s] a plausible, good faith explanation for why [the nondisclosed information] was not cited to the PTO." *Warner-Lambert Co. v. Teva Pharms. USA, Inc.*, 418 F.3d 1326, 1348 (Fed. Cir. 2005). Moreover, "[a]n accused infringer cannot carry its threshold burden simply by pointing to the absence of a credible good faith explanation." *See Larson Mfg. Co. v. Aluminart Prods. Ltd.*, 559 F.3d 1317, 1341 (Fed. Cir. 2009) (citing *Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1368 (Fed. Cir. 2008)). We rarely affirm a grant of summary judgment of inequitable conduct, and in those cases where we have affirmed, the

applicants did something other than fail to disclose a commonly owned application or related litigation. *See, e.g., Paragon Podiatry Lab, Inc. v. KLM Labs. Inc.*, 984 F.2d 1182 (Fed. Cir. 1993) (affirming inference of intent to deceive "not simply from the materiality of the affidavits, but from the affirmative acts of submitting them, their misleading character, and the inability of the examiner to investigate the facts").

Meihao argues that the district court properly found that Leviton intended to deceive the PTO. Meihao refers to a number of findings by the magistrate judge that support its conclusion: (1) Narcisse failed to provide a credible explanation for why he did not notify the PTO about the "copying" of claim language from the Germain application; (2) Leviton had a strong motive to deceive because moving the claims from the Germain application to the '766 patent would allow Leviton to avoid several years of potentially invalidating art; (3) Narcisse's experience and knowledge meant that he should have known about his duty to disclose the Germain application; and (4) there was no evidence of countervailing good faith in Leviton's dealings with the PTO.

Leviton counters that the magistrate judge improperly inferred an intent to deceive. According to Leviton, at the minimum, genuine issues of material fact preclude summary judgment of inequitable conduct. Leviton argues that Narcisse offered a reasonable explanation for why he did not inform the PTO of the Germain application: he did not believe that Germain was prior art because the priority date of the '766 patent was at least three years before Leviton filed the Germain application.

We hold that there are genuine issues of material fact which preclude summary judgment for inequitable conduct, and we remand for an evidentiary hearing. The district court inferred an intent to deceive based on Narcisse's failure to advise the PTO of the Germain applica-

tion and related litigation, which is an omission, not an affirmative misrepresentation. We have not previously affirmed a grant of summary judgment based on a failure to disclose a commonly owned application or related litigation, and we decline to do so on the facts of this case. *See, e.g.*, *Paragon Podiatry*, 984 F.2d 1182. While a district court may make inferences based on the evidence, the district court's inference was not the only reasonable one based on the record. *See Star Scientific*, 537 F.3d at 1366 ("Further, the inference must not only be based on sufficient evidence and be reasonable in light of that evidence, but it must also be the single most reasonable inference able to be drawn from the evidence to meet the clear and convincing standard."). During his deposition, Narcisse provided a plausible explanation for why he did not disclose the Germain application: "[b]ecause the Germain application is not a prior art reference to the '766 application." Narcisse further explained, "[The Germain application] was not material to the patentability of the '766 application. . . . [I]t was clear that the '766 application was prior art . . . to the Germain. And so the Germain was not prior art to the '766, and therefore the Germain application didn't come into the picture at all." While we conclude that Narcisse's failure to disclose the Germain application was material, we cannot agree that Narcisse's explanation of his thoughts at the time were unreasonable as a matter of law. *See Warner-Lambert*, 418 F.3d at 1348. Thus, the district court could not find Narcisse's explanation to be implausible without an evidentiary hearing.

Meihao correctly points out that Narcisse failed to provide any explanation at his deposition for why he did not disclose related litigation. However, the failure to provide an explanation is not independently dispositive of whether a patent prosecutor intended to deceive the PTO. *See Larson*, 559 F.3d at 1341. In addition, Narcisse later

submitted a memorandum during '766 reexamination proceedings disclosing all of the related litigations, and he summarized the inequitable conduct allegations that had been made with respect to the Germain application. While this does not necessarily demonstrate good faith, it may be evidence of good faith. The district court could not find that Leviton intended to deceive the PTO by failing to notify the PTO of related litigations without an evidentiary hearing, i.e., as a matter of law.

Meihao also contends that Leviton cannot now argue that the magistrate judge erred by not hearing live testimony from Narcisse because Leviton never sought to present live testimony. *See, e.g., Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985, 990-91 (1st Cir. 1988) (holding that "an unsuccessful party is not entitled as of right to de novo review . . . of an argument never seasonably raised before the magistrate [judge]"). However, in its opposition to Meihao's motion for costs and attorney fees before the magistrate judge, Leviton specifically noted, "[T]o rule on Meihao's motion, the Court would need to reopen discovery and conduct a bench trial on inequitable conduct . . . ."[2] Leviton repeated this argument before the district judge in objecting to the magistrate judge's report and recommendation, and specifically complained about the lack of live testimony. Thus, Leviton is entitled to argue that it was denied an evidentiary hearing.

Because we hold that genuine issues of material fact exist that preclude summary judgment for inequitable conduct, we vacate the determination of the district court and remand for a bench trial.

---

[2]    Leviton argued that such a bench trial, while necessary to resolve the inequitable conduct issue, would be unjustified because the case was closed and for other reasons stated in the opposition.

### C. *Vexatious Litigation*

We also vacate and remand the district court's decision and fee award with respect vexatious litigation. We first note that the district judge and magistrate judge expressly acknowledged that an attorney fees award on litigation misconduct alone would justify only a smaller award, and thus we must necessarily remand for a determination of fees. In addition, the district court's vexatious litigation determination appeared to depend at least in part on the holding of inequitable conduct, which we vacated. For example, the district judge reasoned, "The inference is inescapable that the misguided efforts by Leviton's counsel to resist discovery on inequitable conduct arose in significant part because it was members of that firm that had engaged in such conduct." This appears to tie the analysis of Leviton's discovery intent to the court's conclusion on inequitable conduct. Thus, because we find that the inequitable conduct holding must be vacated, we must also vacate the vexatious litigation finding.

In addition, we are concerned with part of the district court's analysis related to the work product doctrine. Pursuant to Rule 26(b)(3), "[o]rdinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by another party or its representative . . . ." Fed. R. Civ. Proc. 26(b)(3). However, this is a qualified immunity and such materials may be discovered if another party shows that it has "substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means." *Id.* Opinion work product generally remains immune from discovery unless the requesting party demonstrated "substantial need" and "undue hardship." *See Hickman v. Taylor*, 329 U.S. 495, 510 (1947) ("Not even the most liberal of discovery theories can justify unwarranted inquiries into the files and

mental impressions of an attorney."); *Upjohn Co. v. United States*, 449 U.S. 383, 401-402 (1981) ("As Rule 26 and *Hickman* make clear, such work product cannot be disclosed simply on a showing of substantial need . . . [A] far stronger showing of necessity and unavailability by other means would be required than is needed to justify ordinary work product."). As the magistrate judge acknowledged, exceptions to the work product privilege are "very rare" and exist only in "extraordinary circumstances." *See Chaudry v. Gallerizzo*, 174 F.3d 394, 403 (4th Cir. 1999) (finding that appellant failed to present the "very rare and extraordinary situation justifying disclosure of opinion work product"); *In re Allen*, 106 F.3d 582, 607 (4th Cir. 1997) ("[O]pinion work product enjoys a nearly absolute immunity and can be discovered only in very rare and extraordinary circumstances."). Here, the magistrate judge appears to have found that the work product doctrine would generally apply, but that Meihao satisfied the rare "substantial need" and "undue hardship" exceptions. While the magistrate judge may have ultimately rejected Leviton's work product arguments based on these exceptions, we are not convinced that Leviton's arguments were frivolous. Leviton cannot be required to concede that Meihao satisfied the "substantial need" and "undue hardship" exceptions simply because a defense of inequitable conduct was raised. Moreover, Leviton could not possibly know in advance that the magistrate judge was "mere days away" from releasing an opinion granting Meihao's motion to compel. Thus, we conclude that the district court clearly erred by finding that Leviton engaged in vexatious litigation by raising frivolous work-product objections.

CONCLUSION

For the reasons provided above, the judgment of the District Court is

**VACATED AND REMANDED.**

# United States Court of Appeals for the Federal Circuit

---

**LEVITON MANUFACTURING COMPANY, INC.,**
*Plaintiff,*

**v.**

**UNIVERSAL SECURITY INSTRUMENTS, INC.,**
AND **USI ELECTRIC, INC.,**
*Defendants.*

------------------------------------------------------------------

**SHANGHAI MEIHAO ELECTRIC INC.,**
*Plaintiff-Appellee,*

**v.**

**LEVITON MANUFACTURING COMPANY, INC.,**
*Defendant-Appellant.*

---

2009-1421

---

Appeal from the United States District Court for the District of Maryland in consolidated case no. 05-CV-889, Judge Andre M. Davis.

PROST, *Circuit Judge*, dissenting.

I respectfully dissent because the majority, in my view, overlooks the compelling facts presented in this case

and suggests legal standards contrary to our precedent. Although I am cognizant of this court's rightful hesitance to allow a finding of inequitable conduct on summary judgment and agree with our precedent establishing that such a finding is reserved for a rare case, I firmly believe that this is that rare case. *See M. Eagles Tool Warehouse, Inc. v. Fisher Tooling Co., Inc.*, 439 F.3d 1335, 1339 (Fed. Cir. 2006); *Digital Control, Inc. v. Charles Mach. Works*, 437 F.3d 1309, 1313 (Fed. Cir. 2006) ("Determining at summary judgment that a patent is unenforceable for inequitable conduct is permissible, but uncommon."); *Paragon Podiatry Lab., Inc. v. KLM Labs., Inc.*, 984 F.2d 1182, 1190 (Fed. Cir. 1993) ("While our precedent urges caution in the grant of summary judgment respecting a defense of inequitable conduct, summary judgment is not foreclosed.").

On the facts of this case, I would uphold the district court's finding of inequitable conduct, including its finding of deceptive intent, based on the conduct of one of Leviton Manufacturing Company, Inc.'s ("Leviton's") patent prosecutors, Claude Narcisse ("Narcisse"). Narcisse, a veteran patent prosecutor, with twelve years of patent prosecution experience, drafted claims for a patent application, U.S. Patent Application No. 10/690,776 ("the Germain application"), and filed it with the U.S. Patent and Trademark Office ("PTO") on behalf of Leviton. Within six months, he drafted almost indistinguishable claims for a different patent application, U.S. Patent Application No. 10/827,093 ("the '766 patent application"), also owned by Leviton. Specifically, two independent claims and six dependent claims in the '766 patent application were word-for-word identical to those in the Germain application, with the exception of one insignificant phrase. Although the '766 patent application claimed the same invention as the Germain application, Narcisse attributed the '766 patent application to a completely

different set of inventors. He proceeded to file the '766 patent application with a priority date three-and-a-half years earlier than the Germain application, expedite the prosecution of the '766 patent application, and prosecute the '766 patent application, through issuance as U.S. Patent No. 6,864,766 ("the '766 patent"), without informing the PTO about the co-pending Germain application. Narcisse did not disclose the Germain application even though, as he admitted in his deposition testimony, he alone drafted both sets of claims, was aware of the near identicality of the claims in the two applications, and was familiar with double-patenting rejections, which inevitably arise when different inventive groups submit indistinguishable claims in commonly-owned patent applications. Narcisse's best explanation for his failure to inform the PTO about the Germain application is that he did not think it was material because it was not prior art. This purported justification is not only entirely incorrect but, in my opinion and in that of the district court, incredulous given the many reasons the Germain application should have been disclosed, including its obvious importance to inventorship and double-patenting issues.

In addition to withholding the Germain application, Narcisse did not disclose that the parent patents of the '766 patent were the subject of twelve litigations before the '766 patent issued ("the related litigation"), eight of which had allegations of invalidity, unenforceability, or inequitable conduct pending and unresolved during the prosecution of the '766 patent. At his deposition, Narcisse admitted that he knew about the related litigation, that he was aware that some of the litigations involved allegations of invalidity or unenforceability, and that he was actually involved in three of the litigations before the '766 patent issued. He even admitted that, at the time he prosecuted the '766 patent, he was familiar with the specific Manual of Patent Examining Procedure ("MPEP")

provision, MPEP § 2001.06(c), that mandates disclosure of litigation involving the subject matter of a patent application, as well as allegations of inequitable conduct arising in this litigation. Nevertheless, Narcisse provided absolutely no explanation for failing to disclose the related litigation. By admitting personal knowledge of the related litigation and familiarity with the MPEP provision requiring its disclosure, without providing any justification for withholding this information, Narcisse all but admitted that he withheld the related litigation with intent to deceive.

Under these facts, the district court, in my opinion, properly found inequitable conduct on summary judgment. The majority holds that both the Germain application and the related litigation were material to the prosecution of the '766 patent but concludes that the district court could not infer deceptive intent on summary judgment. Even under the de novo standard of review applicable to summary judgment,[1] I disagree with the

---

[1] I would review the district court's grounds for its "exceptional" case finding, both inequitable conduct and vexatious litigation, under the standard of review applicable to an "exceptional case" finding under 35 U.S.C. § 285, rather than the de novo standard applicable to summary judgment. Determining whether a case is "exceptional" is the first step in deciding whether to award attorney fees under 35 U.S.C. § 285. *See Forest Labs., Inc. v. Abbott Labs.*, 339 F.3d 1324, 1327-29 (Fed. Cir. 2003). We review the "[district] court's factual findings, including whether the case is exceptional, for clear error" but we "review *de novo* whether the court applied the proper legal standard under [35 U.S.C.] § 285." *Id.* at 1328; *Waner v. Ford Motor Co.*, 331 F.3d 851, 857 (Fed. Cir. 2003); *see Reactive Metals & Alloys Corp. v. ESM, Inc.*, 769 F.2d 1578, 1583 (Fed. Cir. 1985). As such, where an inequitable conduct determination was made solely as a predicate for finding the case "exceptional" under 35 U.S.C. § 285, we have reviewed the factual findings,

majority's refusal to uphold the district court's inference of intent to deceive. I would affirm the district court's finding of intent because an inference of deceptive intent is not merely the "single most reasonable inference," *Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1366 (Fed. Cir. 2008), but the *only* reasonable

---

including materiality and intent, for "clear error." *Bruno Indep. Living Aids, Inc. v. Acorn Mobility Servs., Ltd.*, 394 F.3d 1348, 1352, 1354-55 (Fed. Cir. 2005); *see Lighting World, Inc. v. Birchwood Lighting, Inc.*, 382 F.3d 1354, 1366-67 (Fed. Cir. 2004).

Here, the district court determined inequitable conduct, as well as vexatious litigation, as grounds for finding the case "exceptional" in the context of Shanghai Meihao Electric, Inc.'s ("Meihao's") motion for attorney fees. *Leviton Mfg. Co. v. Shanghai Meihao Elec., Inc.*, 613 F. Supp. 2d 670, 678 (D. Md. 2009) (order granting summary judgment) ("*Summary Judgment Order*"). Yet the majority characterizes the district court's inequitable conduct determination as a summary judgment and reviews this determination de novo. Majority Op. at 7, 18. The majority proceeds to review the vexatious litigation finding, the other grounds for the "exceptional case" finding, for "clear error." *Id.* at 20. In so doing, the majority opinion is internally inconsistent and, as to the standard of review applicable to the inequitable conduct determination, incorrect. Given that Meihao filed this motion after the entire consolidated case had been dismissed, there were no claims or counterclaims pending at the time of the inequitable conduct determination. Thus, the inequitable conduct determination was clearly not a summary judgment decision and should not be reviewed as such.

Nevertheless, my disagreement with the majority in no way rests on the standard of review. Even under the more rigorous de novo standard of review, I would affirm the district court's determination of inequitable conduct in light of the particularly egregious facts of this case. As such, I have treated the case under the majority's premise that the district court made its inequitable conduct determination on summary judgment.

inference permitted under the circumstances presented in this case.

I part ways with the majority for a number of reasons. First, in holding the Germain application to be merely "material," the majority appears to sidestep our precedent establishing that the Germain application was "highly material" to the prosecution of the '766 patent based on the possibility that its disclosure could result in a double-patenting rejection of the '766 patent. Second, with respect to deceptive intent, the majority seems to overlook Narcisse's most critical admissions regarding his recognition of the materiality of the withheld information. Specifically, the majority is silent as to Narcisse's awareness that the PTO could issue a double-patenting rejection in a situation like the one presented by the commonly-owned Germain application and '766 patent application, which claimed the identical invention to different inventive groups. The majority is also silent regarding Narcisse's admission that he was familiar with MPEP § 2001.06(c), which unambiguously required him to disclose the related litigation, as well as the pending inequitable conduct allegations in this litigation, to the PTO.

The majority compounds these case-specific problems by suggesting legal standards for which I believe there is no basis in our precedent. In refusing to meaningfully assess the plausibility of Narcisse's purported explanation for withholding the Germain application, the majority diverges from our case law establishing that implausible and specious justifications for withholding material information do not raise a genuine issue of material fact for summary judgment purposes. *See* Majority Op. at 17. Further, the majority suggests that the belated disclosure, in re-examination proceedings, of information withheld during the prosecution of a patent may establish

good faith sufficient to avoid a finding of deceptive intent. *Id.* at 18. This representation contradicts our precedent, which properly recognizes that a delayed disclosure is irrelevant to the inequitable conduct inquiry, an inquiry that focuses exclusively on the patentee's intent during the initial prosecution of the patent. Quite simply, the standards and reasoning put forward by the majority seem to create an insurmountable burden for an inference of deceptive intent.

## I. ANALYSIS

A party asserting inequitable conduct must prove that the patent applicant "(1) made an affirmative misrepresentation of material fact, failed to disclose material information, or submitted false material information, and (2) intended to deceive the [PTO]." *Star Scientific*, 537 F.3d at 1365. Both elements, materiality and intent to deceive, are questions of fact, and at least a threshold level of each must be proven by clear and convincing evidence. *See id.* If the party asserting inequitable conduct establishes threshold levels of materiality and intent, the court must then weigh the materiality and intent, in light of all of the circumstances, to determine whether the applicant's conduct was egregious enough to warrant a finding of inequitable conduct. *Praxair, Inc. v. ATMI, Inc.*, 543 F.3d 1306, 1313-14 (Fed. Cir. 2008); *Ferring B.V. v. Barr Labs., Inc.*, 437 F.3d 1181, 1186 (Fed. Cir. 2006). In making this determination, "[t]he more material the omission or misrepresentation, the lower the level of intent . . . required to establish inequitable conduct." *Star Scientific*, 537 F.3d at 1367.

A.  The Germain Application

1.  Materiality

The majority "agree[s] with Meihao and the district court that . . . the Germain application was material," specifically to inventorship and double-patenting, in the prosecution of the '766 patent.  Majority Op. at 8, 10-13. The district court, however, found that the Germain application was not merely "material" but was "highly material," a significant distinction that the majority does not acknowledge.[2]  *Summary Judgment Order* at 699-700. The district court found the application "highly material," because 37 C.F.R. § 10.23(c)(7) required its disclosure and it could have raised concerns regarding inventorship, double-patenting, and the written description requirement.  *Id.* at 694-700.  Based on the Germain application's importance to inventorship and double-patenting issues, I would uphold the district court's "high materiality" finding.

As the district court concluded, the Germain application was "highly material" because it "could have conceivably served as the basis of a double patenting rejection" of the '766 patent.  *Dayco Prods., Inc. v. Total Containment, Inc.*, 329 F.3d 1358, 1365 (Fed. Cir. 2003); *Akron Polymer Container Corp. v. Exxel Container, Inc.*, 148 F.3d 1380, 1382 (Fed. Cir. 1998).  The majority prop-

---

[2]     The degree of materiality plays a critical role in the intent analysis.  The more material the withheld reference, the more likely that an inference of deceptive intent is "the single most reasonable inference able to be drawn from the evidence."  *See Star Scientific*, 537 F.3d at 1365; *see also Cargill, Inc. v. Canbra Foods, Ltd.*, 476 F.3d 1359, 1366-67 (Fed. Cir. 2007) (quoting *Critikon, Inc. v. Becton Dickinson Vascular Access, Inc.*, 120 F.3d 1253, 1257 (Fed. Cir. 1997)); *Purdue Pharma L.P. v. Endo Pharms. Inc.*, 438 F.3d 1123, 1134-35 (Fed. Cir. 2006).

erly recognizes that, under MPEP § 804, disclosure of the co-pending, commonly-owned Germain application, with nearly identical claims to the earlier-priority '766 patent application, would have led to "an *immediate* provisional [double-patenting] rejection" of each application. *See* MPEP § 804; Majority Op. at 12 (emphasis added). Furthermore, the PTO examiner would not have been required to withdraw the rejection as to the earlier-priority '766 patent application, allowing the '766 patent to issue as opposed to the Germain application. *See* MPEP § 804; Majority Op. at 12. Instead, "the PTO could have rejected the '766 patent for double-patenting." Majority Op. at 12; *see Dayco Prods.*, 329 F.3d at 1365; *Akron Polymer*, 148 F.3d at 1382.

Under our precedent in *Akron Polymer* and *Dayco Products*, which the majority does not mention or distinguish, this potential for a double-patenting rejection is sufficient to make the Germain application "highly material." In both cases, we concluded that a withheld later-priority application was "highly material" to an earlier-priority application claiming similar subject matter because "it could have conceivably served as the basis for a double patenting rejection." *Dayco Prods.*, 329 F.3d at 1365; *Akron Polymer*, 148 F.3d at 1382.

Further, under the "reasonable examiner" standard, our main standard for materiality, "information is material when a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent." *Star Scientific*, 537 F.3d at 1367. Applying this standard, the Germain application's importance to double-patenting would have made it critical to any examiner's evaluation of the '766 patent. Accordingly, I would uphold the district court's determination that, based on its importance to double-patenting concerns, the Germain application was "highly material."

In addition, the Germain application was "highly material" to inventorship issues in the prosecution of the '766 patent. "As a critical requirement for obtaining a patent, inventorship is material." *Perseptive Biosystems, Inc. v. Pharmacia Biotech, Inc.*, 225 F.3d 1315, 1321 (Fed. Cir. 2000). Where information is relevant to inventorship, "whether the inventorship of the patents as issued is correct does not determine the materiality of the [information]." *Id.* at 1322. As such, regardless of whether the inventorship of the '766 patent is correct, the withheld Germain application was "highly material." A "reasonable examiner" evaluating the '766 patent application would have found the co-pending Germain application, which had several nearly identical claims attributed to an entirely different set of inventors, critical in evaluating patentability. The Germain application would have raised serious concerns regarding whether the asserted inventors actually conceived of the invention claimed in the '766 patent. Without the Germain application, however, the examiner had no reason to question the asserted inventorship. Although the majority properly recognizes that disclosure of the Germain application would have raised "serious questions regarding inventorship" and "a substantial inventorship question that would have required additional investigation by the examiner," the majority nonetheless holds that the Germain application was only "material." Majority Op. at 10-11. In my opinion, given how critical the Germain application would have been to triggering these significant inventorship concerns, it was "highly material" to inventorship.

Thus, in light of the importance of the Germain application to inventorship and double-patenting issues in the prosecution of the '766 patent, I would affirm the district court's finding that the Germain application was "highly material."

## 2. Intent

Because "direct evidence of deceptive intent is rarely available," *Star Scientific*, 537 F.3d at 1366, intent to deceive must generally be inferred from circumstantial evidence, *M. Eagles*, 439 F.3d at 1341. In other words, "'smoking gun' evidence is not required . . . to establish an intent to deceive." *Paragon Podiatry*, 984 F.2d at 1189. Nevertheless, the evidence establishing intent "must still be clear and convincing, and inferences drawn from lesser evidence cannot satisfy the deceptive intent requirement." *Star Scientific*, 537 F.3d at 1366. Even gross negligence is not sufficient. *Kingsdown Med. Consultants, Ltd. v. Hollister Inc.*, 863 F.2d 867, 876 (Fed. Cir. 1988).

Rather, to justify an inference of deceptive intent, "the involved conduct, viewed in light of all the evidence, including evidence indicative of good faith, must indicate sufficient culpability to require a finding of intent to deceive." *Astrazeneca Pharms. LP v. Teva Pharms. USA, Inc.*, 583 F.3d 766, 776 (Fed. Cir. 2009). The inference of deceptive intent "must not only be based on sufficient evidence and be reasonable in light of that evidence, but it must also be the single most reasonable inference able to be drawn from the evidence to meet the clear and convincing standard." *Larson Mfg. Co. of S. Dakota, Inc. v. Aluminart Prods. Ltd.*, 559 F.3d 1317, 1340 (Fed. Cir. 2009); *Star Scientific*, 537 F.3d at 1366.

Because an inference of deceptive intent is the *only* reasonable inference to be drawn from the facts surrounding Narcisse's withholding of the Germain application, I disagree with the majority's refusal to uphold the district court's finding of intent. At the time he prosecuted the '766 patent, Narcisse was a seasoned patent attorney, having practiced as a patent prosecutor for approximately twelve years. *See* J.A. 1972-76; *see also Molins PLC v.*

*Textron, Inc.*, 48 F.3d 1172, 1181 (Fed. Cir. 1995) (upholding finding of inequitable conduct where the district court considered the experience of the patent prosecutor).  Not surprisingly, Narcisse admitted in his deposition testimony that when he prosecuted the '766 patent, he was aware of his duty of disclosure and his understanding that "in cases which are not entirely clear, it is better to disclose the information to the [PTO] and let the [PTO] decide what is material."  J.A. 2014.  More specific to the Germain application, Narcisse acknowledged that he was familiar with the possibility of double-patenting rejections in situations, like the one presented in this case, where commonly-owned applications with different inventive groups claim the same invention.  J.A. 1991 ("Q. . . . [I]f two different inventive groups tried to submit the same claim in two different applications, but both were owned by Leviton, that could give rise to a double patenting rejection; is that right? . . .  A. Yes.  Q. And you were aware of that when the '766 patent was prosecuted?  A. Yes.").

Narcisse alone drafted the claims in both the Germain application and the '766 patent application in the course of just six months.  J.A. 1983-84, 2001.  Therefore, he admittedly knew not only that both co-pending applications existed but also that they had what he described as "very similar" claims.  J.A. 1998, 2021.  Despite his intimate knowledge of the Germain application and his familiarity with double-patenting rejections, Narcisse did not disclose the Germain application to the PTO.  J.A. 1998.

The district court properly noted that Leviton had a motive to conceal the Germain application, with a priority date three-and-a-half years later than the '766 patent, during the prosecution of the '766 patent.  *See Summary Judgment Order* at 710.  The PTO's awareness of the

Germain application, at a minimum, would have delayed the expedited prosecution of the '766 patent application arising out of the Petition to Make Special. At worst, the Germain application could have prevented the '766 patent from issuing. Further, with such an earlier priority date, the '766 patent avoided a significant amount of prior art, including the allegedly infringing product in this case, which was manufactured after the priority date of the '766 patent but before the priority date of the Germain application. *See id.*

It seems to me that the circumstances surrounding Leviton's withholding of the Germain application are as egregious as possible short of an explicit admission of intent to deceive the PTO. An experienced patent prosecutor drafted the claims for two co-pending applications, listing entirely different inventors, within months of one another and thus was intimately familiar with their nearly indistinguishable claims. He was also admittedly aware of his duty of disclosure and the potential for a double-patenting rejection in this situation, yet did not disclose the Germain application. In my view, these facts undoubtedly "indicate sufficient culpability to require a finding of intent to deceive." *Kingsdown*, 863 F.2d at 876. As such, I believe Meihao met its burden to prove a threshold level of intent to deceive by clear and convincing evidence.

Given that Meihao met its threshold burden to prove intent, the district court correctly considered Leviton's purported good faith explanation for withholding the Germain application. "The patentee need not offer any good faith explanation unless the [party asserting inequitable conduct] first carries [its] burden to prove a threshold level of intent to deceive by clear and convincing evidence." *Star Scientific*, 537 F.3d at 1368. Once the party asserting inequitable conduct meets its threshold

burden, however, it is "incumbent upon the patentee to rebut the evidence of deceptive intent with a good faith explanation for the alleged misconduct." *Id.*

Throughout Narcisse's deposition, he refused to answer many questions about the prosecution of the '766 patent and his withholding of the Germain application. Nevertheless, Narcisse did put forward two explanations for his failure to disclose the Germain application. First, Narcisse asserted that he did not disclose the Germain application because it was not prior art. Second, Narcisse claimed that he did not believe that 37 C.F.R. § 1.604(b) required disclosure of the Germain application.

In considering a patentee's good faith explanation for withholding information from the PTO, "merely conclusory statements or *completely insupportable, specious*, or conflicting explanations or excuses" do not raise a genuine issue of material fact for summary judgment purposes. *Digital Control*, 437 F.3d at 1314 (emphasis added); *Paragon Podiatry*, 984 F.2d at 1190 (emphasis added); *see Ferring*, 437 F.3d at 1193. In other words, to create a genuine issue of material fact, the patentee must put forward a "*plausible* justification or excuse." *Digital Control*, 437 F.3d at 1314 (emphasis added); *Paragon Podiatry*, 984 F.2d at 1191 (emphasis added). Leviton's contention at oral argument that "for summary judgment purposes, [the district court] need[ed] to take [Narcisse] at his word[;] . . . whether it's a credible explanation or not, it's his explanation," Oral Arg. at 19:45-20:01 *available at* http://oralarguments.cafc.uscourts.gov/mp3/2009-1421.mp3, squarely contradicts this precedent and is therefore wrong as a matter of law. In my opinion, the district court properly rejected Narcisse's justifications as "implausible" and therefore insufficient to raise a genuine issue of material fact. *See Summary Judgment Order* at 710.

First, Narcisse claimed that he did not disclose the Germain application as a result of his belief that the Germain application was not material because it "[wa]s not a prior art reference to the '766 [patent] application." J.A. 1998-99, 2001, 2021-22; *see* Oral Arg. at 7:24-29, 19:15-22, 22:25-33 ("[Narcisse's] testimony is that he did not believe [the Germain application] was material because . . . it was not prior art . . . ."), 60:24-59.

Our precedent makes clear that "[m]ateriality is not limited to prior art but [instead] embraces *any* information that a reasonable examiner would be substantially likely to consider important in deciding whether to allow an application to issue as a patent." *Liquid Dynamics Corp. v. Vaughan Co.*, 449 F.3d 1209, 1226 (Fed. Cir. 2006) (emphasis added); *Bristol-Myers Squibb Co. v. Rhone-Poulenc Rorer, Inc.*, 326 F.3d 1226, 1234 (Fed. Cir. 2003); *GFI, Inc. v. Franklin Corp.*, 265 F.3d 1268, 1274 (Fed. Cir. 2001); *see Critikon*, 120 F.3d at 1258. Thus, it is indisputable that Narcisse's supposed reasoning is entirely incorrect.

More importantly, the district court correctly rejected Narcisse's explanation as implausible. It is implausible that Narcisse, a veteran patent prosecutor and a member of the patent bar for more than a decade, believed that the only material information that must be brought to the PTO's attention is prior art. This purported justification ignores the broad spectrum of information, with which Narcisse was admittedly familiar, that the MPEP and the Code of Federal Regulations require to be disclosed. The most basic patent law treatises, in addition to our case law, explain that materiality is not limited to prior art. *See, e.g.*, 4A-15 Donald S. Chisum, Chisum on Patents § 15.04 (2010) ("A patent applicant's duty to disclose is not limited to disclosing prior art. A patent applicant must disclose any material information to the PTO.");

Robert A. Matthews, Jr., Annotated Patent Digest § 27:47 (2010) ("Just because information may not qualify as prior art does not necessarily mean it is not 'material.'"); *see also* 3-7 Donald S. Chisum, Chisum on Patents § 7.05; 4-11 *id.* § 11.03.

The patent bar, an examination Narcisse passed approximately ten years before prosecuting the '766 patent, requires familiarity with the MPEP, which obligates patent applicants to disclose to the PTO information other than prior art. J.A. 1976 ("I became very familiar with the MPEP, 37 CFR, and old or previous patent bar exams."). In fact, Narcisse admitted his awareness of MPEP provisions that require the disclosure of information that is obviously not prior art, such as MPEP § 2001.06(c), which provides:

> Where the subject matter for which a patent is being sought is or has been involved in litigation, *the existence of such litigation and any other material information arising therefrom must be brought to the attention of the [PTO]. Examples of such material information, include* evidence of possible prior public use or sales, questions of inventorship, *prior art*, allegations of 'fraud,' 'inequitable conduct,' and 'violation of duty of disclosure.' Another example of such material information is any assertion that is made during litigation which is contradictory to assertions made to the examiner.

MPEP § 2001.06(c) (emphases added); J.A. 2008 ("Q. Could you look at 2001.06(c). . . . Were you aware of that rule or provision at the time you prosecuted the '766 [P]atent [A]pplication? A. Yes I was."). Not only does this provision require disclosure of "the existence of . . . litigation" involving the subject matter of a patent application, information that clearly falls outside the realm of prior

art, but also the listed examples of material information show that materiality is not limited to prior art. Rather, prior art is but one example in the list of "examples of such material information." *See* MPEP § 2001.06(c). Narcisse's rationale for failing to disclose the Germain application is thus inconsistent with MPEP provisions that he admits he was familiar with at the time he prosecuted the '766 patent. This specific inconsistency, together with the fact that it is inconceivable that a patent prosecutor with more than a decade of experience would equate materiality solely with prior art, leads me to firmly agree with the district court's conclusion that Narcisse's purported justification is entirely implausible and insufficient to create a genuine issue of material fact. In my view, in light of our case law holding that specious and implausible explanations for withholding material information do not raise a genuine issue of material fact, there is no basis in our precedent for the majority's refusal to allow the district court to reject Narcisse's explanation as "unreasonable" and "implausible" and therefore insufficient to create a genuine issue of material fact on summary judgment. *See* Majority Op. at 17.

Narcisse's second explanation for his failure to disclose the Germain application is based on a technical reading of the language "of another" in 37 C.F.R. § 1.604(b). 37 C.F.R. §1.604(b) provides that "[w]hen an applicant presents a claim known to the applicant to define the same patentable invention claimed in a pending application *of another*, the applicant shall identify that pending application . . . ." 37 C.F.R. § 1.604(b) (emphasis added). In his deposition testimony, Narcisse admitted that he was familiar with the provision at the time he prosecuted the '766 patent but claimed that he "didn't think," "d[id]n't know," and was "not sure" whether the provision would have applied to applications "owned by the same entity." J.A. 2013-14. Yet he never

discussed his understanding of the provision with anyone. J.A. 2014. Even if, as the majority holds, Narcisse was correct that 37 C.F.R. § 1.604(b) did not mandate disclosure of the Germain application, this is a technical argument about a specific disclosure provision. *See* Majority Op. at 9-10. This purported explanation does not affect the other obvious reasons why the Germain application should have been disclosed to the PTO during the prosecution of the '766 patent.

As previously discussed, the Germain application would have been critical to the prosecution of the '766 patent, raising substantial inventorship and double-patenting issues. Any patent practitioner, never mind one with Narcisse's level of experience, would realize that the co-pending Germain application and the '766 patent application, claiming the same invention but attributing it to different people, could not both issue as patents. It is obvious that the PTO would want to be made aware of the co-pending applications to investigate inventorship issues and avoid double-patenting. Narcisse did not provide any rationale for believing these concerns to be inapplicable to his prosecution of the '766 patent. Instead, he admitted that he was aware that the situation that the commonly-owned Germain application and '766 patent application presented "could give rise to a double[-]patenting rejection." J.A. 1991.

Leviton's proposed inference that Narcisse did not disclose the Germain application because he did not believe it was material prior art and did not think 37 C.F.R. § 1.604(b) required its disclosure is simply unreasonable. Instead, given the obvious reasons the application would have been highly important to the prosecution of the '766 patent, as well as Narcisse's awareness of the substantially similar claims and that such a situation could lead to a double-patenting rejection, the overwhelm-

ing circumstantial evidence suggests that Narcisse purposefully withheld the Germain application. In light of these glaring facts, an inference of deceptive intent is the *only* reasonable inference to be drawn from Narcisse's withholding of the Germain application. *See Star Scientific*, 537 F.3d at 1366. I would therefore uphold the district court's inference of deceptive intent on summary judgment.[3]

## B. Related Litigation

It is undisputed that the parent patents of the '766 patent were involved in twelve litigations before the '766 patent issued and that Leviton did not disclose any of these litigations to the PTO during the prosecution of the '766 patent. A review of the district court docket for each litigation shows that of these twelve litigations, six were filed, and four had been pending for almost a year, before Leviton filed the '766 patent application. Eight of these litigations had allegations of invalidity, unenforceability, or inequitable conduct pending before Leviton applied for

---

[3] I am not sure what to make of the majority's statement that "[w]e rarely affirm a grant of summary judgment of inequitable conduct, and in those cases where we have affirmed, the applicants did something other than fail to disclose a commonly owned application or related litigation." Majority Op. at 15-16; *see id.* at 17. The majority appears to be resting, at least in part, on the idea that we have never faced facts analogous to those presented in this case. I agree with the majority that the striking facts of this case are unusual, yet I cannot agree that this is a reason not to affirm the district court's finding of inequitable conduct. We regularly decide cases involving novel facts by applying our legal standards to the new factual situation presented. In my view, the novelty of the factual situation currently before the court suggests only that the exceptional and egregious conduct in this case is not common amongst practitioners before the PTO.

the '766 patent, four of which involved such allegations for more than eight months before prosecution began.

## 1. Materiality

Like the majority, I would uphold the district court's finding that the withheld related litigation was material. *See* Majority Op. at 14-15; *Summary Judgment Order* at 701. As the majority recognized, MPEP § 2001.06(c) explicitly requires the disclosure of the "existence of . . . litigation" involving "the subject matter for which a patent is being sought," as well as "any other material information arising" from the litigation, including "allegations of 'fraud,' 'inequitable conduct,' and 'violation of duty of disclosure.'" MPEP § 2001.06(c). We have held that "[i]t is clear from the language of § 2001.06(c) that the existence of the litigation itself is material information that an examiner needs to have. It is important because it signals the examiner that other material information relevant to patentability may become available through the litigation proceedings." *Nilssen v. Osram Slyvania, Inc.*, 504 F.3d 1223, 1234 (Fed. Cir. 2007). Thus, the existence of the related litigation, as well as the pending allegations of inequitable conduct and unenforceability, was material information that Leviton had a duty to disclose. That Leviton ultimately avoided a finding of invalidity or unenforceability in these litigations is irrelevant to whether a reasonable examiner, at the time the '766 patent was being prosecuted, would have found the pending litigations and their inequitable conduct allegations important in assessing patentability.

## 2. Intent

As with the Germain application, I disagree with the majority's conclusion that the district court could not infer, on summary judgment, that Narcisse withheld

information about the related litigation with deceptive intent. *See* Majority Op. at 17-18. In light of Narcisse's critical admissions during his deposition, there is simply no other inference to be drawn from the evidence.

First, Narcisse admitted that he was aware of the pending related litigation and that he knew some of these litigations raised allegations of invalidity and unenforceability. J.A. 2008-10. He further acknowledged that he was actively involved in three of these litigations before the '766 patent issued. J.A. 2008-10, 2020-21. As such, there is no question that Narcisse knew of the related litigation.

Narcisse also admitted that he was familiar with the MPEP provision that mandates disclosure of the related litigation. Specifically, Narcisse acknowledged his awareness of MPEP § 2001.06(c), which requires disclosure of the "existence of . . . litigation" involving the subject matter of a patent application and any allegations of inequitable conduct in these litigations. MPEP § 2001.06(c); J.A. 2008 ("Q. Could you look at 2001.06(c). . . . Were you aware of that rule or provision at the time you prosecuted the '766 [P]atent [A]pplication? A. Yes I was. Q. And you were aware that this was part of your duty of disclosure? A. Yes."). Narcisse also admitted that he understood that this provision was part of his "duty of disclosure." J.A. 2008. Notably, the majority opinion nowhere references this significant admission.[4]

---

[4]    This is perhaps a result of the parties' errors at oral argument. In arguing that Narcisse admitted his awareness of his duty to disclose the related litigation, Meihao's counsel cited the wrong page of Narcisse's deposition testimony. Meihao's counsel cited to J.A. 1975, but the proper citation is J.A. 2008. *See* Oral Arg. at 43:52-45:55; J.A. 2008. As such, Leviton's counsel was also incorrect in asserting his belief that there was not

Narcisse further admitted that he did not disclose the existence of the related litigation.  J.A. 2010.  Narcisse's admissions as to his knowledge of the related litigation and of his duty, yet failure, to disclose the information are more than sufficient for Meihao to meet its threshold burden to show deceptive intent.

Leviton has never attempted to rebut this showing by providing a justification for Narcisse's failure to disclose the related litigation during the prosecution of the '766 patent.  The majority recognizes Narcisse's "fail[ure] to provide any explanation at his deposition for why he did not disclose [the] related litigation" but goes on to cite *Larson Manufacturing* for the proposition that "the failure to provide an explanation is not independently dispositive of whether a patent prosecutor intended to deceive the PTO."  Majority Op. at 17.  *Larson Manufacturing*, however, states only the familiar rule that "an accused infringer cannot carry its threshold burden simply by pointing to the absence of a credible good faith explanation."  559 F.3d at 1341.  In other words, "the patentee is not required to offer evidence of good faith unless the accused infringer first meets its burden to prove—by clear and convincing evidence—the threshold level of deceptive intent."  *Id.*  Meihao does not rely on Narcisse's failure to provide a good faith explanation in order to meet its threshold burden to establish deceptive intent.  Narcisse's many critical admissions regarding his withholding of the related litigation, despite knowing of the information and his duty to disclose it, are more than sufficient to pass this threshold.  Once Meihao satisfied this burden, it became "incumbent upon [Leviton] to rebut the evidence of deceptive intent with a good faith explanation for the alleged misconduct."  *Star Scientific*, 537 F.3d at 1368.

"any testimony that [Narcisse was] aware of this particular provision," namely MPEP § 2001.06(c).  Oral Arg. at 59:01-11.

Yet Narcisse has put forward no such explanation. The fact that Narcisse has provided no excuse for his actions is not, as the majority implies, Meihao's only evidence of intent. Rather, Narcisse's failure to provide a good faith explanation serves only to prevent Leviton from rebutting Meihao's strong showing of intent to deceive.

The majority proceeds to reason that Narcisse's belated disclosure of the related litigation in reexamination proceedings, more than two years after the '766 patent had issued and Meihao had raised the inequitable conduct allegations in this case, "may be evidence of good faith." Majority Op. at 18. This proposition, for which the majority provides no citation, conflicts with our precedent. We have held that a patentee's disclosure of withheld information in re-examination and re-issuance proceedings is "irrelevant" to whether the patentee committed inequitable conduct in acquiring the patent, an inquiry that centers on the patentee's "intent during the prosecution of the original application." *Bristol-Myers Squibb Co.*, 326 F.3d at 1241; *see Molins PLC*, 48 F.3d at 1182 ("We recognize that [the withheld references] were cited eventually to the PTO and that the examiner . . . passed the reexamination application to issue thereafter. However, the references were not cited when they should have been."). Thus, the majority's suggestion that Leviton may be able to establish good faith in the prosecution of the '766 patent by its disclosure of the related litigation years after the patent issued, where Narcisse knew of the related litigation and his duty to disclose it at the time of the initial prosecution, is, in my view, contrary to our precedent.

In sum, Narcisse all but admitted that he withheld the related litigation with deceptive intent. If we do not accept that an inference of deceptive intent is the "single most reasonable inference," *Star Scientific*, 537 F.3d at

1366, where a patent prosecutor provides absolutely no explanation, good faith or otherwise, for his conduct and admits (1) that he knew of and had personal involvement with the withheld material information; (2) that he was familiar with specific MPEP provision that, by its express, unambiguous terms, mandates disclosure of the information; (3) that he understood this provision to be part of his duty of disclosure to the PTO; and (4) that he still did not disclose the information, then I fail to see when an inference of intent on summary judgment will ever be permissible. The *only* reasonable inference to be drawn from Narcisse's unexplained failure to disclose the related litigation, despite his admitted knowledge of the pending related litigation and the MPEP provision that requires its disclosure, is that he deliberately withheld information about the litigations from the PTO. Therefore, I would uphold the district court's inference of deceptive intent.

## C. Lack of an Evidentiary Hearing

Leviton argues that the district court should have held an evidentiary hearing where Narcisse could fully explain his conduct and the court could assess his credibility. Accepting the majority's premise that this was a summary judgment motion, *see supra* n.1, Leviton had "ample opportunity" to create a genuine issue of material fact to avoid summary judgment. *Paragon Podiatry*, 984 F.2d at 1192. Yet Leviton failed to do so.

Throughout Narcisse's deposition, he was repeatedly asked about his rationale for withholding both the Germain application and the related litigation but refused to answer numerous questions on these topics. Nevertheless, when Meihao filed a motion for summary judgment, Leviton chose not to submit an affidavit from Narcisse to further explain his decisions to withhold this information. At the oral hearing on Meihao's summary judgment

motion, the district court accepted new evidence from Leviton, but Leviton still did not attempt to supplement the record with oral testimony or affidavits from Narcisse or any other witness.

"On summary judgment, in order to create a genuine issue, [Leviton] bore the burden of submitting an affidavit from [Narcisse] to contradict [Meihao's] evidence of intent if [it] believed that testimony from [Narcisse] would establish credible evidence for the withholding." *Ferring*, 437 F.3d at 1192. At oral argument, Leviton represented that it did not submit any additional evidence, because it thought it would win on summary judgment. Oral Arg. at 4:14-5:26. This, however, was a strategic decision for which Leviton must suffer the consequences. Moreover, Leviton has not indicated or even suggested that there is additional evidence or explanation that might change the result. *See Paragon Podiatry*, 984 F.2d at 1192. It merely argues that, on the record before the court, it should have survived summary judgment. Because Leviton failed to put forward evidence raising a genuine issue of material fact, *Ferring*, 437 F.3d at 1193, Leviton was not entitled to avoid summary judgment and thus have an evidentiary hearing. Accordingly, the district court properly granted summary judgment of inequitable conduct against Leviton.

## II. CONCLUSION

As the district court recognized, Leviton's arguments "comprise in the main a jumble of miscitations to legal standards; blatant ignoring of other, controlling standards; reliance on arguments that are . . . utterly irrelevant to the issues presented; and a veritable sea of red herrings." *Summary Judgment Order* at 679. By accepting many of these arguments, the majority opinion arguably creates troubling new standards for intent to deceive.

The majority overlooks the disturbing facts of this case in which an experienced patent prosecutor withheld critical information with which he was intimately familiar, despite his awareness of reasons that the PTO would want to be made aware of the information and lack of a credible reason for the omissions.  In overturning the district court's finding of deceptive intent on these facts, the majority's legal standards and reasoning take the burden to establish deceptive intent to an unprecedented level.  I cannot agree with the majority's analysis and would affirm the district court's inequitable conduct determination, including its finding of deceptive intent.